# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARIA ANITA PAEZ-VILLA AND ANDRES TOVAR,<br><br>Defendant. | Case No.: 16-cr-01531-BTM<br><br>**ORDER DENYING DEFENDANT'S MOTIONS TO (1) SUPPRESS EVIDENCE DUE TO UNLAWFUL SEIZURE; (2) SUPPRESS STATEMENTS; (3) SUPPRESS CELL PHONE [ECF NO. 38]** |

Defendant Andres Tovar ("Tovar") has filed motions to suppress (1) evidence due to an unlawful seizure; (2) statements; and (3) the search of his cell phone. [ECF No. 38.] For the reasons below, Tovar's motions are DENIED.

**I.    FACTS**

On September 2, 2016, Tovar and his mother, Maria Anita Paez-Villa ("Paez-Villa"), were charged in a superseding indictment with conspiracy to import methamphetamine, in violation of 21 U.S.C. §§ 952, 960 and 963, and importation of methamphetamine, in violation of 21 U.S.C. §§ 952 and 960. Tovar filed the instant motions to suppress on October 14, 2016. The Court held an evidentiary hearing on the motions on November 22 and 23, 2016. Unless otherwise noted, the following summary of facts is derived from the evidence presented at the hearing. Because Tovar challenges his August 30, 2016 detention as unsupported by probable cause, the Court focuses on the facts available to the Government at the time of Tovar's arrest.

On June 2, 2016, Paez-Villa was arrested at the Tecate Port of Entry ("POE") after a secondary vehicle inspection resulted in discovery of approximately 18.78 kilograms of methamphetamine concealed in the gas tank of a Volvo of which she was the driver, sole occupant, and registered owner. In response to post-arrest questioning, she invoked her right to silence. On June 29, 2016, the grand jury returned an indictment charging her with one count of importation of methamphetamine in violation of 21 U.S.C. §§ 952 and 960. [ECF No. 10.]

After Paez-Villa's arrest, Special Agent Arturo Becerra ("Becerra") of the U.S. Immigrations and Customs Enforcement Homeland Security Investigations ("HSI") initiated an investigation. He reviewed Paez-Villa's personal history report, which identified Tovar as her son and indicated they lived together at 711 Sawtelle Avenue in San Diego.

He also reviewed records of the Treasury Enforcement Communication System ("TECS"), which monitors and tracks all crossing activity into and out of the United States. He noticed from the TECS records that on June 2nd, the day of the arrest, Paez-Villa had crossed the border at the Tecate POE in the vehicle lane at 6:51 a.m., and Tovar had crossed in the pedestrian lane of the Tecate POE at 6:17 a.m. From the TECS records, Becerra also determined that for at least the previous month, Tovar and Paez-Villa had a pattern of entering the United States via the Tecate POE concurrently, usually within 30 minutes of each other, with Tovar crossing the border in the pedestrian lane and Paez-Villa crossing in the vehicle lane in the Volvo. According to the TECS records, Tovar had been referred to secondary inspection while crossing the Tecate POE in the Volvo on May 7, 2015. TECS records also showed that although for the past year Tovar had crossed the border through Tecate roughly once a week, he did not cross at all after June 2nd.

//

Becerra ran a criminal history check for Tovar, which showed he had a prior state court conviction for importation of marijuana. The arrest records from that offense showed Tovar had been arrested at the Tecate POE on June 22, 2010, as the driver of a vehicle concealing approximately 140 pounds of marijuana in all four tires. As a result of this conviction, a note had been placed in the TECS system indicating Tovar was a previous marijuana smuggler. The prior smuggling offense was a factor a Customs and Border Patrol officer could rely on in deciding whether to refer a vehicle Tovar was travelling in to secondary inspection.

Becerra set about trying to locate Tovar as a potential material witness. On July 6, 2016, Becerra went to 711 Sawtelle, the address Paez-Villa had given as her home address, but which was actually occupied by Caro Meraz. Meraz was familiar with Tovar. She knew he had a prior drug smuggling conviction. She added that she had not seen him in months and believed he was living in Mexico. Becerra tried unsuccessfully to find Tovar at various United States addresses and phone numbers associated with him. Becerra noticed that although for the past year Tovar had crossed the border through Tecate at least once a week, he had not entered the United States since June 2nd, and concluded Tovar was living in Mexico.

Meanwhile, Paez-Villa and her counsel requested a meeting to discuss her pending importation charge. The meeting took place on August 4, 2016, and in addition to Paez-Villa and her attorney, was attended by Becerra, another agent, Assistant U.S. Attorney Kyle Martin, and a Spanish interpreter. During the meeting, Paez-Villa said that prior to her arrest, she and her son had both been living in Tecate, Mexico. She gave the agents the Tecate address. She said her son had purchased the Volvo for her as a gift, and that on June 1, the day before the incident, he left with the Volvo in the morning, returned home on foot at around noon, and then returned with the vehicle at around 3:00 p.m. According

1  to Paez-Villa, on the morning of her arrest, she and her son drove together in the
2  Volvo to the Tecate POE. When they got there, Tovar exited the car to cross in
3  the pedestrian lane. The wait time for vehicles that morning was 20-25 minutes,
4  meaning Paez-Villa sat in traffic while her son crossed on foot. Had Paez-Villa
5  not been arrested, she would have picked Tovar up after crossing the POE in the
6  Volvo, which is what they planned to do that day and was something they had
7  done several times before.

8  Paez-Villa's personal history report indicated she was a self-employed
9  housekeeper. On August 9, 2016, Becerra interviewed one of her employers, an
10 elderly couple living in San Diego named the Dobberteens. The Dobberteens
11 said Ms. Paez-Villa had been their housecleaner for a number of years. She
12 came to their house every other week, usually arriving between 8 and 9 a.m.
13 They believed she was usually dropped off by her son in a tan Volvo.

14 Agent Becerra thereafter set about arranging an opportunity to question
15 Tovar. An officer working with Becerra contacted the Mexican police agency in
16 Tecate to seek assistance tracking down Tovar. On August 30, 2016, one of the
17 Mexican officers responded to the Tecate address provided by Paez-Villa and
18 found Tovar. According to Becerra, the officer told Tovar he was not under
19 arrest, but asked him to come to the local police station in Tecate for questioning.
20 Shortly thereafter, Tovar went to the Tecate police station voluntarily. Upon his
21 arrival, he was put on the phone with Officer Uriarte of the Imperial County
22 Sheriff's Department. Officer Uriarte told Tovar that HSI agents wanted to speak
23 to him at the Tecate POE, and "impl[ied] that the reason[] why he wanted to
24 speak to him was in regards to the legal permanent resident card of his
25 mother…." Partial Tr. of Proceedings [ECF No. 49] at 51:5-6. Tovar asked what
26 time he should report, and was told to arrive around noon.

27 At approximately 12:20 p.m., Tovar presented himself at the primary
28 pedestrian lane of the Tecate POE. Based on a TECS lookout alert that

1  indicated Tovar was wanted for questioning, he was handcuffed and taken to the
2  secondary inspection office.  There, Tovar was subjected to a patdown search,
3  his cell phone, wallet, and belt were removed from him and placed in a bin, and
4  his leg was shackled to one of the secondary office benches.

5  Agent Becerra was advised of Tovar's presence at the Tecate border
6  station and arrived at the Tecate POE at approximately 1:20 p.m.  At around 1:55
7  p.m., he uncuffed Tovar's leg iron, told him "we needed to discuss circumstances
8  in reference to his mother's arrest" (id. at 24:25-25:1), and brought him to another
9  office to be interviewed.

10  Before the interview, Tovar indicated to Becerra that he was worried about
11  his girlfriend, who was waiting for him outside.  Becerra noticed Tovar's cell
12  phone "was continuously ringing," which Becerra believed was Tovar's girlfriend
13  trying to reach him.  Tovar contends in his declaration in support of the motion to
14  suppress that he asked if he "could go outside and talk to my girlfriend" and was
15  told he could not. Decl. Tovar ¶¶ 16-17, 22-23 [ECF No. 38-2 at 7].  Becerra did
16  not recall Tovar making such a request, but he acknowledged he did not allow
17  Tovar to use the cell phone.

18  At the start of the interview, Becerra told Tovar that he had "some quick
19  questions" to ask and that he wanted to read Tovar his rights.  Becerra identified
20  himself and his co-agent, who was also present, as criminal investigators who
21  investigated, among other crimes, drug trafficking offenses.  Agent Becerra
22  presented a form that contained a Spanish language version of the Miranda
23  warnings and a consent to waiver of Miranda rights, and said "real quick, I just
24  want to give you this."  Becerra read the form to Tovar and asked him sign it.
25  Tovar signed the form.

26  The interview lasted approximately 55 minutes.  At the end of the interview,
27  Becerra said he needed to make a phone call and would be back to talk to Tovar.
28  Tovar asked whether it would take much longer; Becerra said he was not

1  sure.  Tovar said he had to go to work, and that he had told his employer he
2  would be late but didn't think he would have to take the whole day.  Becerra
3  asked whether Tovar was talking about a construction job, and then responded
4  "okay, cool."

5  Becerra then escorted Tovar back to the secondary office and ankle-cuffed
6  him to the bench.  Becerra gave Tovar a form consenting to the search of Tovar's
7  cell phone.  Tovar signed the form.  After making a call to AUSA Martin, Becerra
8  returned and arrested Tovar as a material witness in his mother's case.

9  The next day, August 31, 2016, the Magistrate Judge signed a material
10 witness complaint identifying Tovar as a material witness in his mother's criminal
11 case.  [ECF No. 1.]  On September 2, 2016, the grand jury returned a
12 superseding indictment charging Tovar and his mother as co-conspirators in the
13 June 2, 2016 importation of methamphetamine.  [ECF No. 26.]

14 **II.    DISCUSSION**

15 A. <u>Motion to Suppress Tovar's Arrest</u>

16 Tovar moves to suppress his detention at the Tecate POE, and all
17 evidence that flowed from the detention, as in violation of his Fourth Amendment
18 right against unreasonable search and seizure.  He argues his detention at the
19 Tecate POE amounted to an arrest for the purpose of custodial interrogation, but
20 that at the time he was detained, the government lacked sufficient evidence
21 linking him to the June 2nd importation offense to support a finding of probable
22 cause.  Def. Mot. to Suppress [ECF No. 38-1] at 7-8.  In opposition, the
23 Government argues Tovar's detention was justified under 18 U.S.C. § 3144,
24 which allows "a judicial officer … [to] order the arrest" of a person where "the
25 testimony of the person is material in a criminal proceeding" and it "may be
26 impracticable to secure the presense of the person by subpoena."  18 U.S.C. §
27 3144.  Gov't Opp. at 7-8.  Alternatively, the Government argues it had probable
28 cause to believe Tovar was involved in the importation offense.  <u>Id.</u> at 8-10.

1    The parties do not dispute that Tovar was placed under arrest, for Fourth
2 Amendment purposes, upon his arrival at the Tecate POE on August 30, 2016.
3 Although neither party fixes the precise point of arrest, Defendant appears to
4 take the position that Tovar was effectively arrested shortly after his arrival when
5 he was handcuffed by the primary officer, as he was never free to leave after that
6 point.  The Government does not dispute this contention.  The Ninth Circuit has
7 held that "temporary detention occasioned by border crossing formalities" does
8 not amount to an arrest.  See United States v. Bravo, 295 F.3d 1002, (9th Cir.
9 2002) (at the border, the standard for determining whether a person is under
10 arrest is "whether a reasonable person would believe that he is being subjected
11 to more than the 'temporary detention occasioned by border crossing
12 formalities.'") (quoting United States v. Butler, 249 F.3d 1094, 1100 (9th Cir.
13 2001).  On August 30th, however, Tovar was not at the Tecate POE to cross the
14 border.  The Court thus accepts Defendant's position that he was arrested at the
15 point when he was handcuffed by the primary inspection officer and taken to the
16 secondary inspection office to await Agent Becerra.  See United States v.
17 Carranza, 289 F.3d 634, 640 (9th Cir. 2002) (earliest point defendant could be
18 considered under arrest was when he was "placed in a security office to await the
19 arrival of the investigating customs agent").

20    The question is whether the arrest was justified.  The Government's first
21 position, that Tovar could be arrested as a material witness under 18 U.S.C. §
22 3144 despite the lack of a material witness complaint, presents a novel issue of
23 constitutional law.  Under the doctrine of constitutional avoidance, the Court
24 therefore begins with the Government's second position, namely, that at the time
25 Tovar arrived at the Tecate POE on August 30th, it had probable cause to arrest
26 him for the importation offense.

27    Border agents need probable cause to make a warrantless arrest.  United
28 States v. Hernandez, 322 F.3d 592, 596 (9th Cir. 2002).  Probable cause exists if

"under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [Tovar] had committed a crime." See Carranza, 289 F.3d at 640 (quoting United States v. Garza, 980 F.2d 546, 550 (9th Cir.1992)). Where the government relies on an informant's tip, "[i]t is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" Illinois v. Gates, 462 U.S. 213, 244-45 (1983). Factors that help determine whether an informant is credible include the informant's basis for knowledge, and police corroboration of the information. See, e.g., id.; United States v. Tarazon, 989 F.2d 1045, 1048-49 (9th Cir. 1993). However, corroboration of innocent facts provided by an tipster of dubious credibility does not supply probable cause. United States v. Hall, 113 F.3d 157, 159 (9th Cir. 1997) ("Once a person believes that the police have sufficient evidence to convict him, his statement that another person is more important to his criminal enterprise than he gains little credibility from its inculpatory aspect.").

Here, the Court finds that as of the time Tovar arrived at the Tecate POE, the Government had probable cause to believe he was involved in his mother's June 2nd importation of methamphetamine. Prior to August 30, 2016, Agent Becerra had learned Tovar was the son of Paez-Villa, that he had a prior conviction for smuggling drugs in a vehicle through the Tecate POE, that he had an unusual history of crossing the border at the Tecate POE by foot as his mother crossed in the Volvo, and that he had crossed just 34 minutes before his mother on the day of her arrest. He also had determined that Tovar was living in Mexico, and despite having previously crossed the border once a week, he had stopped crossing after his mother's arrest on June 2nd.

Paez-Villa provided an additional piece of information relevant to the probable cause determination—she explained the border-crossing pattern. She

said she and her son would drive to the Tecate POE together, Tovar would exit the car and cross by foot, and then he would rejoin her on the other side. This was what they planned to do on June 2nd, and it was something they had done many times before.

The information from Paez-Villa helped establish a fact that might reasonably have been inferred from the TECS records, namely, that Tovar was a passenger in the drug-laden Volvo as it approached the border destined for the United States. In the Ninth Circuit, such evidence is sufficient to provide probable cause for an arrest on a drug importation offense. United States v. Heiden, 508 F.2d 898, 901-02 (9th Cir.1974) (Heiden's presence as a passenger in a vehicle that contained 110 pounds of marijuana sufficient to give officers probable cause to arrest him for importation offense); United States v. Buckner, 179 F.3d 834, 837-38 (9th Cir. 1999) (passenger's presence in drug-laden car sufficient to support arrest for importation).

Although Tovar exited the vehicle upon arrival at the port of entry, this did not make his conduct less suspicious. Because Tovar had a prior smuggling conviction, leaving the vehicle reduced the possibility it would be sent to secondary inspection. Facts that indicate an intent to deflect agents' suspicion away from a drug-laden vehicle are consistent with involvement in a drug-smuggling scheme. See United States v. Baltodano, 215 F.3d 1334 (9th Cir. 2000) (probable cause supported arrest of a back-seat passenger in a drug-laden vehicle because, among other things, his presence was part of a ruse that the vehicle's occupants were on a family vacation).

Tovar argues Paez-Villa's statements should be given no weight in the probable cause analysis, because they were self-interested, made for the purpose of implicating her son for the crime of which she stood accused, and thus were not of the category of statements against penal interest typically viewed as inherently reliable. Def.'s Suppl. Br. [ECF No. 51-1] at 3-5. While

1  statements against penal interest are regarded as reliable, they are not the only
2  sort of informant statements that can support probable cause.  "The
3  circumstances which a magistrate or judge may consider include an informant's
4  reliability or basis of knowledge[;] [h]owever, a deficiency in one of these
5  elements may be compensated for, in determining the overall reliability of a tip,
6  by a strong showing as to the other, or by some other indicia of reliability."
7  United States v. Ayers, 924 F.2d 1468, 1478 (9th Cir. 1991).  Here, the Court
8  finds that the corroborated portions of Paez-Villa's statements were, under the
9  totality of the circumstances, sufficiently reliable to support a finding of probable
10 cause.  As Tovar's mother and housemate, Paez-Villa had an unassailable basis
11 for personal knowledge of Tovar's behavior.  Moreover, her statements
12 explaining Tovar's crossing history were consistent with, and corroborated by,
13 both of their TECS crossing records, as well as by Paez-Villa's employers, the
14 Dobberteens, who believed it was Tovar that dropped Paez-Villa off for work in
15 the tan Volvo.

16      Tovar also argues that Agent Becerra must not have viewed Paez-Villa as
17 reliable, since the purpose of her debrief was to convince the Government of her
18 innocence, and Becerra has not recommended that her charges be dismissed.
19 But as the Supreme Court has noted, "[w]e have never required that informants
20 used by the police be infallible." Gates, 462 U.S. at 258 n.14.  Becerra could
21 properly credit the corroborated portions of Paez-Villa's statements without
22 accepting her claim of innocence as a whole.

23     The Court therefore finds that at the time Tovar arrived at the Tecate POE
24 on August 30, 2016, the Government had probable cause to believe he was
25 involved in the June 2nd importation of methamphetamine.  Although at the time
26 he detained Tovar, Agent Becerra was focused on Tovar's status as a possible
27 material witness, Fourth Amendment reasonableness is an objective standard,
28 so Becerra's motivation for detaining Tovar is irrelevant to the Court's probable

cause analysis.  See Horton v. California, 496 U.S. 128, 138 (1990) ("[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.").  Since the Court concludes Tovar's detention was supported by probable cause to believe he had committed a crime, it need not, and does not, address the Government's argument that the detention was supported by probable cause to believe Tovar was a material witness in his mother's case.

Defendant's motion to suppress his arrest, and all evidence discovered as a result of his arrest, will therefore be denied.

B. Motion to Suppress Post-Arrest Statements

Tovar consented in writing to the waiver of his Miranda rights.  Although he concedes his waiver of Miranda rights was knowing and intelligent, he argues the waiver was involuntary.  He argues he was brought to the border station under the false pretense that he was going there to retrieve his mother's legal permanent resident card, see Decl. Tovar ¶ 4, and once he was there, Agent Becerra told him he was going to ask "real quick" questions.  Tovar contends these were deceptive statements that misled him into believing he was going to be released once the questioning was over, and thus misled, he signed the Miranda waiver only because he thought it would hasten his release.  He also argues that Becerra's refusal to let him speak to his girlfriend was a form of psychological pressure that caused him to sign the waiver.[1]

The government bears the burden of proving by a preponderance of the evidence that a defendant's waiver of Miranda rights was voluntary.  Colorado v.

---

[1] Both sides lodged copies of the video of Tovar's interrogation.  See ECF Nos. 39, 41.  During the hearing, the parties played excerpts of the beginning and end of the interview and represented those portions were relevant to their positions on the instant motion.  Defense counsel stipulated during the evidentiary hearing that there was nothing in the remainder of the tape that evidenced threats, coercion, or promises on the part of the interrogating agents.

1  Connelly, 479 U.S. 157, 168 (1986).  The relinquishment of Miranda rights "must
2  have been voluntary in the sense that it was the product of a free and deliberate
3  choice rather than intimidation, coercion, or deception." Colorado v. Spring, 479
4  U.S. 564, 573-74 (1987) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).
5  The reviewing court must look to the "totality of the circumstances involved and
6  their effect upon the will of the defendant." United States v. Crawford, 372 F.3d
7  1048, 1060 (9th Cir. 2004) (quoting Schneckloth v. Bustamonte, 412 U.S. 218,
8  226-27 (1973)).  Factors to consider include the youth of the defendant, his
9  intelligence, the lack of advisement concerning his constitutional rights, the
10 length of detention, the repeated and prolonged nature of the questioning, and
11 the use of physical punishment such as the deprivation of food or sleep.
12 Schneckloth, 412 U.S. at 226.  However, "'[t]rickery, deceit, even impersonation
13 do not render a confession inadmissible, certainly in noncustodial situations and
14 usually in custodial ones as well, unless government agents make threats or
15 promises.'" United States v. Crawford, 372 F.3d 1048, 1060-61 (9th Cir. 2004)
16 (quoting United States v. Kontny, 238 F.3d 815, 817 (7th Cir.2001)).  "[A]s long
17 as th[e] decision is a product of the suspect's own balancing of competing
18 considerations, the confession is voluntary." United States v. Miller, 984 F.2d
19 1028, 1031 (9th Cir.1993) (quoting Miller v. Fenton, 796 F.2d 598, 605 (3d Cir.
20 1986)).
21       Here, the Court finds that Tovar's waiver of Miranda rights was voluntary.
22 At the time he signed the waiver form, Tovar had been detained for just over an
23 hour and a half.  He was a 27-year-old United States citizen with a prior
24 conviction for marijuana smuggling, neither so young nor so vulnerable or
25 inexperienced that he could not assert his rights.  There is no evidence Tovar
26 was in physical discomfort at any point.  The excerpt of the interview video in
27 which Tovar signs the Miranda form shows a professionally courteous
28 interaction.

12

16-cr-01531-BTM

Officer Uriarte used a deceptive tactic to lure Tovar to the Tecate border station. However, the use of deception to lure a suspect in for questioning does not, on its own, render a subsequent statement involuntary. Crawford, 372 F.3d at 1061 (pretext only influenced suspect's decision to go to FBI office and did not, on its own, render subsequent confession involuntary). Also, Agent Becerra corrected the deception when he told Tovar before the interview began, and before Tovar signed the waiver form, that he would be questioned about his mother's arrest for the methamphetamine offense.[2] Thus, although it influenced Tovar's decision to go to the border station, by the time Tovar was interviewed, Becerra had corrected Officer Uriarte's mischaracterization of the reason Tovar was summoned to the Tecate POE, so the deception had no bearing on Tovar's subsequent decision to waive his Miranda rights.

Tovar contends that Agent Becerra's characterization of the interview as nothing more than "real quick" questions misled him into believing he would be released when it was over. Operating under this misconception, he says, he only waived his rights and gave statements in the hope that doing so would speed his eventual release. Even accepting Tovar's premise that Agent Becerra's use of the phrase "real quick" to describe the interview was misleading, the Court does not find it amounted to coercion sufficient to overcome Tovar's will. Critically, Agent Becerra did not promise Tovar he would be released if he signed the Miranda waiver, nor did he tell Tovar he would be released when the interview was over. See Crawford, 372 F.3d at 1060-61 (deceipt does not render custodial confession inadmissible in the absence of threats or promises). Rather, the source of the assumption that signing the form and answering questions would

---

[2] Although Tovar was not told he was a suspect in that offense, the statement that he was being asked about his mother's importation offense was sufficiently accurate to be non-deceptive. See Spring, 479 U.S. at 576 (agents' failure to tell murder suspect he would be asked about murder was not deception that invalidated Miranda waiver).

1 hasten Tovar's release was Tovar himself.  See Miller, 984 F.2d at 1032 (finding
2 "no causal relationship" between defendant's decision to confess and agent's
3 potentially coercive conduct).  Under these circumstances, the Court does not
4 find Agent Becerra's reference to the interview as "real quick" questions, standing
5 alone, was enough to overcome Tovar's will and cause him to sign the waiver.

6      And while Tovar objects to Agent Becerra's failure to tell him he would be
7 held in custody whether or not he waived his Miranda rights and answered
8 questions, it is not clear from the record that Agent Becerra knew this to be the
9 case prior to the interview, since it was not until afterwards that he called the
10 prosecutor to discuss what to do with Tovar.  Even if Agent Becerra did know
11 before the interview that Tovar would be kept in custody, his failure to volunteer
12 that information to Tovar was not an "affirmative mispresentation[]" that can fairly
13 be characterized as deception, nor was it accompanied by a promise or threat so
14 as to support a finding of coercion.  Collazo v. Estelle, 940 F.2d 411, 419 (9th
15 Cir. 1991) ("In certain circumstances, the Court has found affirmative
16 misrepresentations by the police sufficient to invalidate a suspect's waiver of the
17 Fifth Amendment privilege") (quoting Spring, 479 U.S. at 576 n. 8); see Crawford,
18 372 F.3d at 1060-61 (deceit does not render custodial confession inadmissible
19 in the absence of threats or promises).

20      Moreover, insofar as Tovar claims he lacked a sufficient understanding of
21 what could happen to him after the interview was over, the Miranda advisal itself
22 becomes relevant.  Tovar was read the Miranda form before he signed the
23 waiver, and thus was told "[a]nything you say can be used against you in a court
24 of law, or other proceedings."  Gov't Resp. [ECF No. 40-1] Ex. 7.  If Tovar
25 thought that he would not be exposed to criminal consequences if he waived his
26 rights and made statements, the Miranda warning itself advised otherwise.
27 Miranda v. Arizona, 384 U.S. 436, 469 (1966) (purpose of pre-interrogation
28 explanation that statements can be used against the person is to make "the

individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest").

Tovar also argues Agent Becerra's refusal to let him speak to his girlfriend created psychological pressure that overcame his will. The Court begins with Tovar's evidence, which is that he asked twice "if I could go outside and talk to my girlfriend" and was denied. Decl. Tovar ¶¶ 16-17, 22-23. During the evidentiary hearing, Agent Becerra recalled that Tovar was concerned about his girlfriend, although he did not remember Tovar asking him to go outside and speak to her. Since Becerra did not contradict Tovar's version of events as set forth in his declaration, the Court accepts it as true for purposes of this motion. See, e.g., Haynes v. Washington, 373 U.S. 503, 507-11 (1963) (determining the extent to which Haynes' version of events during his interrogation was contradicted by officers' testimony for purposes of evaluating voluntariness of confession).[3]

Tovar argues Agent Becerra's refusal to let him talk to his girlfriend rendered his waiver of rights involuntary under Haynes. In Haynes, over the course of a 16-hour detention, the defendant "made several specific requests of the police that he be permitted to call an attorney and to call his wife." Id. at 507. His requests were refused, but "he was told he might make a call if he confessed." Id. Haynes was thus "confronted with the express threat of continued incommunicado detention and induced by the promise of communication with and access to family" if he should confess, rendering his

---

[3] Agent Becerra testified that Tovar's cell phone was ringing "continuously," and that Becerra assumed it was Tovar's girlfriend calling. While Becerra acknowledged he did not let Tovar use the phone, there is no evidence in the record that Tovar asked to use it. Tovar's cell phone was placed in a bin in the secondary office shortly after he arrived at the Tecate POE. The Miranda advisal and interview took place in a different room, where it was not likely the ringing phone could be heard. In any event, Tovar has not submitted evidence how the ringing phone affected him, if at all. His declaration does not state, for example, that he believed the ringing phone was his girlfriend calling, nor does it indicate that the ringing phone affected his decision to waive his rights. See Decl. Tovar. The Court therefore focuses on Tovar's contention, which is that Becerra's refusal to let him go outside to talk to his girlfriend was a form of psychological coercion.

subsequent confession involuntary.  Id. at 514.

This case is distinguishable from Haynes.  Unlike Haynes, Tovar was never told he would be held indefinitely if he failed to sign the Miranda form.  He also was not told that if he signed the form, he would be allowed to talk to his girlfriend.  There was thus no "express threat" here at all, which was a factor critical to the outcome of Haynes.  See id. at 514.  The agents simply said "no" when, an hour and a half into his detention, Tovar asked to talk to his girlfriend.  Under these circumstances, the agents' refusal to let Tovar speak to his girlfriend did not amount to psychological coercion sufficient to overcome his will.  See, e.g., Cunningham v. City of Wenatchee, 345 F.3d 802, 810-11 (9th Cir. 2003) (suspect's statement voluntary although interrogation lasted eight hours, suspect was denied request to call therapist despite having mental disorder and requiring bi-polar medication, and interrogator suggested that cooperation could lead to treatment rather than prison).

The Court finds that the government has established by a preponderance of the evidence that Tovar's waiver of Miranda rights and subsequent statements were voluntary.  Accordingly, Tovar's Motion to Suppress Statements will be denied.

### C. Motion to Suppress Cell Phone

Tovar argues his written consent to the search of his cell phone was involuntary "for the same reasons his Miranda waiver and statements were involuntary", namely that he believed he would be released if he signed the consent form.  Def. Mot. Suppress at 12:12-15.  The Court rejects Tovar's challenge to the voluntariness of his consent to search his cell phone for the same reasons set forth above.  The Court finds the consent voluntary and denies the motion.

//
//

## III. CONCLUSION AND ORDER

For the foregoing reasons, Defendant's motions to suppress (1) evidence due to an unlawful seizure, (2) statements, and (3) the search of his cell phone are DENIED.

IT IS SO ORDERED:

Dated:  December 21, 2016

_____
Barry Ted Moskowitz, Chief Judge
United States District Court